Filed 12/2/22  P. v. Huang CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C094390 |
| Plaintiff and Respondent, | (Super. Ct. No. 17FE007444) |
| v. | |
| SEAN HUANG, | |
| Defendant and Appellant. | |

A jury found defendant Sean Huang guilty of two counts of premeditated first degree murder, and it found true multiple firearm enhancement allegations.  On appeal, defendant claims:  (1) the trial court erred by admitting evidence related to firearms, ammunition, and magazines that were not used to commit the murders but were discovered in a search of his residence; (2) we must remand the matter to the trial court so it may determine whether to strike the imposed firearm enhancements or to impose a

1

lesser enhancement; (3) we must remand to the trial court with directions to strike all but one firearm enhancement pursuant to recent changes made to Penal Code section 1385[1] by Senate Bill No. 81 (2021-2022 Reg. Sess.) (Senate Bill No. 81); and (4) the trial court erred when it imposed various fines and assessments without first determining his ability to pay, relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157.  Defendant also requests that we review the transcript of the in camera hearing on his *Pitchess*[2] motion to ensure the trial court properly adhered to appropriate procedures.  The Attorney General agrees that this request for review is appropriate.

Finding no error, we affirm the judgment.

## FACTS AND PROCEEDINGS

*Factual Background*

Defendant's friend, Tongdun Pan, lived in a house in Sacramento dedicated to growing marijuana.[3]  Four rooms were used to grow marijuana, plywood covered the doors and windows of the house, and the house contained a significant amount of grow lights, fertilizers, and equipment needed to grow marijuana.  There were approximately 700 plants in the house.  Defendant was aware that Pan grew marijuana because his wife had invested in the operation, and he acknowledged he did not want Pan's marijuana to be stolen.

On April 23, 2017, at around 3:00 a.m., Pan called defendant to ask for help.  He told defendant that someone had rammed their vehicle into his garage door and was

---

[1]  Further undesignated statutory references are to the Penal Code.

[2]  *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

[3]  The spelling "Pan" appears multiple times throughout the record, including in defendant's testimony.  Defendant's interpreter at trial clarified that the correct spelling is "Poon," but we will use "Pan" for consistency.

2

trying to rob him. A subsequent investigation confirmed that the garage door of the house had been pushed in, creating a gap large enough for a person to enter.

Defendant testified that about a year before the night at issue, Pan had called him because someone was trying to steal from him by attempting to break through his bathroom window. On that occasion, defendant brought a handgun to Pan's house because "it fit[] [his] hand better" than his other handgun, and he is a "pretty good shot" with that gun.

Defendant testified that when Pan called him on this occasion, he grabbed a shotgun as well as the same handgun he had brought with him when Pan called him the year before, and ammunition, and went to Pan's house, which was approximately two miles from his house. When he arrived, he saw that the garage was damaged, suspected someone was trying to steal the marijuana, and called out for Pan but received no response. He did not bring his cellphone with him, so he sat inside his van with the door open. Suddenly, a man behind the van said something in a loud and angry manner. The man, later identified as Glen Myers, fired two shots at him. He got out of the van and tried to return fire, but he had not loaded his gun, so he loaded his gun and fired two shots in Myers' direction. He realized he had been shot, and he began to chase Myers out of instinct and because he feared for his life. Myers shot at him while running away, so he fired the remaining rounds in his handgun at Myers because he was so nervous. Defendant returned to his car to get his shotgun and then jogged to where Myers had fallen to the ground.

Defendant testified that as he approached Myers, he saw a woman later identified as Ahjanique Hodges next to Myers. He believed Hodges was pointing a gun at him, so he shot at Hodges with his shotgun, and she screamed for help and ran away. He then "fired a few shots" at Myers from a distance of approximately eight inches because Myers was still holding a gun. After shooting Myers, defendant reloaded his shotgun and

3

ran after Hodges, shooting at her as she ran away. Hodges fell to the ground, and defendant approached her and shot her again.

A subsequent investigation showed Myers had been shot in the back through to the chest, as well as in his leg, wrist, torso, and head. There was a handgun about 20 feet south of his body; it had a six round capacity, and there were five rounds inside the gun, suggesting that Myers had only fired one round that morning. Defendant could not explain the apparent contradiction in his testimony that Myers held a gun at the time he shot Myers at close range and the subsequent discovery of the gun 20 feet from Myers' body. Hodges had been shot multiple times in her chest, back, left buttock, back of her left arm, and wrist. Both had been killed by defendant.

Officers found 11 casings from a nine-millimeter handgun at the scene; 10 were fired from defendant's handgun, and one was fired from the handgun found 20 feet from Myers' body. There were two shotgun shell casings in front of the grow house.

At 4:20 a.m., sheriff's deputies found defendant in front of his house near a parked van. He was bleeding, and there was a handgun and shotgun in the van. He told deputies that he had received a call from his uncle, who told him that someone had driven a vehicle into the garage in an attempt to rob him. He said he grabbed his shotgun and handgun and went to Pan's house, where he engaged in a shootout with a man and woman. He claimed that someone was trying to kill him and that he left the scene after the man shot him in the stomach. He had been shot once in the side; he was taken to the hospital and was released six hours later. Defendant was interviewed at the hospital, and the interview continued at police headquarters after he was discharged from the hospital. During that interview, defendant stated that three children lived in his residence "sometimes." The children were ages 15, nine or 10, and two. There was no evidence that the children were in the residence on the morning of the murders. The interview was

4

played for the jury, and a transcript of the interview was handed out to the jury and appears in the record.[4]

Matthew Schoen, then a patrol officer with the Sacramento Police Department, participated in a search of defendant's residence after the murders. Schoen discovered a gun, several magazines, and a bullet on the dining room table, two pounds of processed marijuana in a bedroom closet, a shotgun in the bedroom inside a box on the bed, and $3,500 in cash inside a purse.[5] The prosecution introduced photographs of the guns, magazines, ammunition, and marijuana.[6] Defendant asserted the shotgun recovered at his house was purchased by his wife and that all of the firearms were possessed legally.

*Procedural Background*

A jury found defendant guilty of the premeditated first degree murders of Myers and Hodges. As to the Myers murder, the jury found true the enhancement allegations that defendant personally used a firearm, intentionally and personally discharged a firearm, and personally and intentionally discharged a firearm, which proximately caused Myers' death. (§ 12022.53, subds. (b), (c) & (d).) As to the Hodges murder, the jury found true enhancement allegations under section 12022.53, subdivisions (b) and (c), but the jury verdict form as to the section 12022.53, subdivision (d) enhancement mistakenly referred to Myers, not Hodges, and therefore the trial court struck that enhancement allegation in the interest of justice and pursuant to an agreement between the parties. The jury further found true the special circumstance allegation that defendant committed multiple murders. (§ 190.2, subd. (a)(3).)

---

[4] We discuss defendant's challenge to the admission of this evidence, *post*.

[5] Defendant claims on appeal that this evidence was improperly admitted because it was irrelevant and unduly prejudicial; we address that claim *post*.

[6] The exhibits are not included in the record on appeal.

5

On June 25, 2021, the trial court sentenced defendant to two consecutive life sentences without the possibility of parole for the murder convictions. The court imposed a consecutive sentence of 25 years to life for the section 12022.53, subdivision (d) enhancement related to the Myers murder, and a consecutive sentence of 20 years for the section 12022.53, subdivision (c) enhancement related to the Hodges murder. The remaining firearm enhancements were stayed. The court ordered defendant to pay various fines and fees, which we discuss in greater detail *post*.

Defendant filed a timely notice of appeal. The case was fully briefed in September 2022, and was assigned to this panel on September 30, 2022. The parties waived argument and the case was deemed submitted on November 28, 2022.

## DISCUSSION

### I

### *Evidentiary Issues*

Defendant contends the trial court erred when it admitted irrelevant photographic evidence of the firearms, magazines, and ammunition found in his residence but not used in the murders. In the alternative, he claims the court abused its discretion by admitting the evidence, even if relevant, because the evidence was substantially more prejudicial than probative. (Evid. Code, § 352.) Finally, he argues the court "magnified" its error by admitting defendant's statement that three children sometimes lived in his residence.

We conclude the photographic evidence and accompanying testimony was relevant, and the court did not abuse its discretion by admitting the evidence. We further conclude that the evidence of children living in the residence was irrelevant, but the error in admitting the evidence was harmless.

A. *Legal Background*

We review the trial court's decision whether to admit evidence for abuse of discretion. (*People v. Harris* (2013) 57 Cal.4th 804, 841.) But discretion is delimited by the applicable legal standards, a departure from which constitutes an "abuse" of

6

discretion. (*City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297.) "The discretion conferred upon the court 'is a discretion, governed by legal rules, to do justice according to law or to the analogies of the law, as near as may be.' [Citation.] That is to say, the range of judicial discretion is determined by analogy to the rules contained in the general law and in the specific body or system of law in which the discretionary authority is granted." (*County of Yolo v. Garcia* (1993) 20 Cal.App.4th 1771, 1778.)

"No evidence is admissible except relevant evidence," (Evid. Code, § 350) and "all relevant evidence is admissible unless excluded under the federal or California Constitution or by statute" (*People v. Carter* (2005) 36 Cal.4th 1114, 1166). " 'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "The test of relevance is whether the evidence tends ' "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive.' " (*Carter,* at p. 1166; Evid. Code, § 600, subd. (b) ["An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action"].)

" 'Whether a particular inference can be drawn from the evidence is a question of law.' " (*People v. Johnson* (2019) 32 Cal.App.5th 26, 58.) " 'Speculative inferences that are derived from evidence cannot be deemed to be relevant to establish the speculatively inferred fact in light of Evidence Code section 210, which requires that evidence offered to prove or disprove a disputed fact must have a tendency in reason for such purpose.' " (*People v. Babbitt* (1988) 45 Cal.3d 660, 682.)

Relevant evidence is subject to exclusion under Evidence Code section 352, which provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

7

B. *Procedural Background*

We previously recounted the testimony regarding the firearm, magazines, and ammunition on the dining room table, the shotgun in the bedroom, the marijuana in the closet, and the cash in the purse.

Trial counsel did not object when this evidence was first introduced through Detective Schoen's testimony. But later, during a break in the testimony to address admission of the photographs of this evidence, counsel objected on the basis that the firearms, magazines, and ammunition were not used in the commission of the alleged offenses, and defendant was not prohibited from possessing firearms. Counsel argued, "[T]he amount of firearms and magazines sitting around . . . make [defendant] look like he has a propensity for gun violence, and I don't think that's proper."

The prosecutor responded that the photographs were relevant to the issue of defendant's premeditation because the items on the table "appear to have been left there, arguably, in a hurry or a in [*sic*] decisionmaking process." The prosecutor argued that the shotgun was left on a bed that looked like it was used for sleeping, and "at the time that [defendant] chose the two weapons that he took with him, he made a conscious choice to leave these two weapons behind." She concluded, "[T]he manner in which they were left is absolutely relevant for a jury to determine whether or not that factors into his premeditation at the time he left this house."

The prosecutor further recognized that there was evidence that children lived in defendant's home. She argued that evidence could be relevant to show that defendant did not normally store his guns as they were found following the murders; rather, defendant made a decision in the early morning hours of which guns to bring with him.

The trial court overruled defendant's objection. It noted that any potential prejudice "should be considered relative to the People's representation that there would be no argument about the defendant's propensity to [*sic*] gun violence," and it observed, "what comes from these two photographs is a selection of two firearms from the

8

possibility of other firearms." It continued, "[T]he People's disposition of premeditation is relevant to an inference that if it takes a focused thought process to select two out of four weapons, there's a clear point in time when there's a delineation being made by the defendant as he's looking, for lack of a better term, at his inventory of firearms and selecting which of the long guns and which of the pistols he'll take with him for whatever purpose he may have to use them. I think that's relevant to the issue of premeditation. It's also relevant to an issue of what I call lethality, which it is the lethal nature of one gun over another gun for potential use."

Following the trial court's ruling, counsel argued evidence that children lived in the house should be excluded under Evidence Code section 352 because there was no allegation of child neglect, whether or not children lived in the house had nothing to do with the murders, and evidence that defendant left guns out with children in the house would be substantially more prejudicial than probative.

The prosecutor summarized defendant's statement at the hospital following the murders, when he said that three children--who were not his children--lived in the house "sometimes." She again asserted that the evidence was relevant because children living in the house made it more likely that defendant did not normally store his guns as they were found, and she reaffirmed that she did not plan to argue child neglect or endangerment. She acknowledged that she did not intend to discuss the children during closing argument because she did not think it was relevant.

The trial court determined that it would not require the prosecution to excise any reference to the children in defendant's statement because no evidence suggested that the children were in the house on the night of the murders, but it cautioned that the evidence should not be underscored for the reasons raised by defense counsel.

C. *Forfeiture*

The Attorney General contends defendant forfeited this issue by failing to object to the firearm, ammunition, and magazine evidence until a break in the testimony. We

disagree. "[C]hallenges to procedures or to the admission of evidence normally are forfeited unless timely raised in the trial court." (*People v. Black* (2007) 41 Cal.4th 799, 810; Evid. Code, § 353.) However, "[w]hat is important is that the objection fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling. If the court overrules the objection, the objecting party may argue on appeal that the evidence should have been excluded for the reason asserted at trial." (*People v. Partida* (2005) 37 Cal.4th 428, 435.) Here, counsel objected to the evidence of other firearms, magazines, and ammunition, and defendant's statements regarding children living in the house, on the bases that the evidence was irrelevant and substantially more prejudicial than probative. The prosecution responded to those objections, and the trial court ruled. Defendant did not forfeit his arguments.

D. *Relevance of Firearm Evidence*

Defendant acknowledges that the issue of his premeditation was a disputed fact of consequence to the outcome of the case, but he contends evidence of the firearms, magazines, and ammunition found in his house but not used to commit the murders was not relevant to that issue. Specifically, he argues the act of leaving two firearms in his house had no logical tendency to show premeditation because he legally possessed the firearms, and his possession of other firearms had no connection to his mental state or to the offenses.

The Attorney General responds that the evidence was relevant to the issue of premeditation because it tended to show that defendant assessed his choice of weapons before leaving his residence, and refuted any suggestion that he acted impulsively. We agree that defendant acknowledged that he chose the handgun he brought to Pan's house over the other handgun later found on his dining room table because he has "a big hand

10

and that handgun is big enough for my hand and it fits in my hand better." Defendant also told the detectives that he was a "pretty good shot" with the handgun.

Defendant was charged with first degree premeditated murder of Myers and Hodges. "The very definition of 'premeditation' encompasses the idea that a defendant thought about or considered the act beforehand. ' " '[P]remeditation' means thought over in advance," ' and ' " '[d]eliberation' refers to careful weighing of considerations in forming a course of action." ' [Citation.] 'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.' " (*People v. Pearson* (2013) 56 Cal.4th 393, 443.) The jury was instructed: "The defendant acted with premeditation if he decided to kill before completing the acts that caused death. [¶] The length of time the person spends considering whether to kill does not, alone, determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time."

To support his argument that the evidence of other firearms, ammunition, and magazines was irrelevant, defendant relies on *People v. Henderson* (1976) 58 Cal.App.3d 349. In *Henderson*, the defendant was convicted of assault with a deadly weapon on a police officer after he shot through a bathroom wall at officers serving a search warrant. (*Id.* at p. 351.) The prosecutor argued that the defendant's possession of another firearm in a pair of trousers in a separate bedroom was relevant to the issue of intent, although there was no contention that the firearm had been used in the offense. (*Id.* at p. 359.) The appellate court held the trial court's decision to admit the evidence was error. (*Id.* at p. 360.) The court concluded it was not reasonable to infer that the possessor of a firearm intended to commit an assault with a deadly weapon. (*Ibid.*) Instead, possession of a

11

weapon not used in a crime only leads to the inference that the defendant is the kind of person who surrounds himself with deadly weapons, an inference irrelevant to the determination of guilt or innocence. (*Ibid.*)

*Henderson* is distinguishable because the evidence of the firearms, magazines, and ammunition here tended to demonstrate defendant's thought process in the moments before he left for Pan's house, which was highly relevant to premeditation. Evidence that defendant left a shotgun in an open box on a bed appearing to have been used for sleeping, and a handgun, magazines, and ammunition on the dining room table, tended to support the inference that defendant actively considered his arming options prior to leaving for the grow house. Defendant chose to bring one shotgun and one handgun, and he acknowledged that he chose the handgun based on its fit and his ability to shoot with it. In other words, the evidence tended to show that on the morning of the murders, defendant evaluated his available options of firearms and chose the weapons that would allow him to inflict lethal force most effectively.

The Attorney General points to two post-*Henderson* decisions, *People v. Smith* (2003) 30 Cal.4th 581 and *People v. Jablonski* (2006) 37 Cal.4th 774, 822. In *Smith*, the defendant challenged the admission of a gun belonging to him but that did not match the description of the murder weapon, and ammunition that did not match the murder weapon or the other gun. (*Id*. at p. 613.) Our Supreme Court explained that the "evidence did not merely show that defendant was the sort of person who carries deadly weapons, but it was relevant to his state of mind when he shot [the victim]." (*Ibid*.) The court concluded evidence that defendant possessed an unloaded gun was relevant to the defendant's credibility because he had argued he only intended to intimidate, but not shoot, the victim. (*Id.* at pp. 613-614.) Had the defendant only intended to intimidate the victim, he could have used the unloaded gun that he possessed. (*Id.* at p. 614.)

In *People v. Jablonski*, *supra*, 37 Cal.4th at page 822, our Supreme Court held that homemade handcuffs and a stun gun recovered from the defendant's vehicle, but not used

12

during the murder, were relevant to prove premeditation. The court explained, "premeditation was a disputed fact and evidence that defendant carried devices to the crime scene that could have been used to restrain or immobilize the victims was relevant to premeditation." (*Id.* at p. 821.) Accordingly, the court held that these items' relevance did not compel their exclusion from evidence. (*Id.* at pp. 822-823.) The court distinguished *Henderson* on the basis that the weapons in *Henderson* "had no relationship at all to the charged crime and, by extension, were not relevant to any issue in dispute." (*Id.* at p. 822.)

*Jablonski* in particular is instructive here; while the defendant in *Jablonski* did not use the handcuffs or the stun gun in the crimes, his possession of those items demonstrated premeditation. Similarly, here, evidence of the firearms, magazines, and ammunition tended to show that defendant considered and selected arming options based on ease of use and lethality.

E. *Evidence Code Section 352*

Defendant contends that, even if the evidence of the firearms, magazines, and ammunition was relevant, the probative value of the evidence was substantially outweighed by "significant" prejudice to him under Evidence Code section 352. Specifically, he contends the probative value of the evidence was minimal, and the evidence "inevitably leads to speculation that evokes an emotional bias and invites the jurors to prejudge the case based on something that has no legitimate connection to the case." We conclude the trial court did not abuse its discretion when it admitted the evidence over defendant's Evidence Code section 352 objection.

"The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to

13

evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.  In applying section 352, 'prejudicial' is not synonymous with "damaging." ' " (*People v. Karis* (1988) 46 Cal.3d 612, 638; *People v. Holford* (2012) 203 Cal.App.4th 155, 167.)  " '[E]vidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction.  In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose.' " (*People v. Branch* (2001) 91 Cal.App.4th 274, 286.)  "Evidence is not inadmissible under section 352 unless the probative value is 'substantially' outweighed by the probability of a 'substantial danger' of undue prejudice or other statutory counterweights." (*Holford*, at p. 167.)

We disagree that the evidence, as defendant puts it, "inevitably leads to speculation that evokes an emotional bias that invites the jurors to prejudge the case based on something that has no legitimate connection to the case."  First, as we have discussed, the evidence was relevant to the issue of defendant's premeditation.  Second, the undisputed evidence in the case demonstrated that defendant responded to Pan's call for assistance by bringing two guns with him, and that he ultimately gunned down two people, first by shooting them as they ran away, and then by shooting them at close range as they lay on the ground.  Given the other evidence in this case, evidence that defendant also possessed two other guns at his residence did not "uniquely tend[ ] to evoke an emotional bias against the defendant." (See *People v. Karis*, *supra*, 46 Cal.3d at p. 638.)  Moreover, any potential prejudice was minimized by defendant's testimony that he owned the guns legally and the prosecutor's very limited mention of these guns in closing argument, and only in reference to premeditation and deliberation.  The trial court did not abuse its discretion by not excluding the evidence under Evidence Code section 352.

14

F.  *Evidence of Children Living in the Home*

Defendant contends that the trial court "magnified the error" of admitting evidence of the firearms, ammunition, and magazines, by not excluding his statement that children lived in the residence part of the time.  He argues the evidence was both irrelevant and, to the extent it was minimally relevant, inadmissible under Evidence Code section 352.

Assuming the trial court erred when it admitted the evidence, the error was clearly harmless because defendant suffered no prejudice as a result of its admission.  " 'It is . . . well settled that the erroneous admission or exclusion of evidence does not require reversal except where the error or errors caused a miscarriage of justice.  [Citation.]  "[A] 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." ' "  (*People v. Memory* (2010) 182 Cal.App.4th 835, 862; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

It is not reasonably probable defendant would have achieved a more favorable result absent the assumed error.  There was no evidence that defendant typically stored the firearms in a location that the children could access them, no evidence that defendant endangered the children, and no evidence that children were in the residence on the morning of the murders.  Additionally, pursuant to the court's order, the prosecution did not discuss the evidence in closing, elicit testimony regarding the presence of children in the house, or suggest in any way that defendant was guilty because he kept guns in a house where children sometimes lived.  Finally, given the other evidence in this case, evidence that children sometimes lived in the residence was not inflammatory.

Because we conclude that the evidence of the other firearms, ammunition, and magazines was relevant and not unduly prejudicial, and that the admission of the evidence children sometimes lived in the house was clearly harmless, defendant has not shown that the trial court committed prejudicial error.

15

II

*Section 12022.53 Enhancements*

Defendant claims he is entitled to a new sentencing hearing to allow the trial court to consider striking the firearm enhancement it imposed under section 12022.53, subdivision (d) and sentence on a lesser firearm enhancement. Defendant asserts that the court was unaware of its discretion to strike the section 12022.53, subdivision (d) enhancement and impose a lesser enhancement because, at the time of sentencing, there was a split of authority as to whether a trial court could impose an *uncharged* lesser enhancement where the jury had only found true an enhancement allegation under section 12022.53, subdivision (d). But as we will explain, that split of authority had no bearing on the trial court's discretion in this case, where the jury found true the lesser included enhancement allegations pursuant to section 12022.53, subdivisions (b) and (c) as to each victim. Therefore, remand is not required.[7]

Section 12022.53 provides for sentencing enhancements based on a defendant's personal use of a firearm in the commission of certain enumerated felonies. There is a 10-year enhancement for the personal use of a firearm (*id.*, subd. (b)); a 20-year enhancement for the personal and intentional discharge of a firearm (*id.*, subd. (c)); and a 25-year-to-life enhancement for the personal and intentional discharge of a firearm causing great bodily injury or death (*id.*, subd. (d)).

Here, the jury found true enhancement allegations under section 12022.53, subdivisions (b), (c), and (d) with respect to the murder of Myers, and under section 12022.53, subdivisions (b) and (c) with respect to the murder of Hodges. At the time of defendant's sentencing hearing in June 2021, the trial court was authorized, "in the interest of justice pursuant to Section 1385 and at the time of sentencing, [to] strike or

___

[7] We do not address the Attorney General's argument that defendant forfeited this claim by failing to object because defendant's claim clearly lacks merit.

16

dismiss an enhancement otherwise required to be imposed by this section." (§ 12022.53, subd. (h).) Section 12022.53, subdivision (f) provided: "If more than one enhancement per person is found true under this section, the court shall impose upon that person the enhancement that provides the longest term of imprisonment." Accordingly, the court was authorized to dismiss an enhancement under section 12022.53, subdivision (d) where doing so was in the interest of justice, and "[i]n a case where the jury had also returned true findings of the lesser enhancements under section 12022.53, subdivisions (b) and (c), the striking of an enhancement under section 12022.53, subdivision (d) would leave intact the remaining findings, and an enhancement under the greatest of those provisions would be mandatory unless those findings were also stricken in the interests of justice." (*People v. Morrison* (2019) 34 Cal.App.5th 217, 222.)

Defendant contends that the trial court was not aware of its discretion to impose a lesser firearm enhancement because, at the time of defendant's sentencing, Courts of Appeal were split on the question of whether a trial court could strike a section 12022.53, subdivision (d) enhancement and, in its place, impose an *uncharged* lesser enhancement under section 12022.53, subdivision (b) or (c). (*People v. Tirado* (2022) 12 Cal.5th 688, 695.) Following defendant's sentencing hearing, our Supreme Court resolved that split and concluded that trial courts do indeed have discretion to impose an enhancement under section 12022.53, subdivision (b) or (c) when those enhancements are not specifically listed in the accusatory pleading. (*Tirado*, at p. 699.) However, the split of authority resolved by *Tirado* had no effect on the trial court's discretion in this case because, as we have discussed, the jury found true enhancements under section 12022.53, subdivisions (b), (c), *and* (d). Thus, the split of authority as to whether a sentencing court could impose a lesser *uncharged* section 12022.53 enhancement did not affect the trial court's discretion. Because the law was clear at the time of defendant's sentencing, defendant's claim fails.

III

*Senate Bill No. 81*

Defendant contends remand is required to allow the court to resentence him pursuant to revisions to section 1385 made by Senate Bill No. 81, which provides that a defendant may not be sentenced to more than one firearm enhancement per case. He recognizes that Senate Bill No. 81 includes a savings clause expressly providing that the bill's amendments only apply to sentencings occurring after January 1, 2022, but he contends that he is entitled to the benefits of the statutory amendments despite the savings clause because his case is not yet final, relying on *In re Estrada* (1965) 63 Cal.2d 742 (*Estrada*). He further argues that to deny him the benefit of Senate Bill No. 81 would deprive him of due process and equal protection under the federal and California constitutions.

As we will explain, the presumption of retroactivity stated in *Estrada* does not apply where the Legislature has included an express savings clause in the statute, and therefore Senate Bill No. 81 does not apply retroactively to defendant's case. Additionally, defendant's equal protection argument fails because there is a rational basis for the Legislature's decision to treat similarly situated criminal defendants differently based on the date of their sentencing hearings. Thus, we reject defendant's claim.

A. *Savings Clause*

Before Senate Bill No. 81 was enacted, section 1385 provided that a trial court could dismiss sentencing enhancements in the interest of justice. Senate Bill No. 81 amended section 1385 by adding subdivision (c), which provides in part: "(1) Notwithstanding any other law, the court *shall* dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute. [¶] (2) In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present. Proof of the

18

presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety." (Stats. 2021, ch. 721, § 1, subd. (c)(1)-(2), italics added.) One such mitigating circumstance was that "[m]ultiple enhancements are alleged in a single case. In this instance, all enhancements beyond a single enhancement shall be dismissed." (§ 1385, former subd. (c)(3)(B); Stats. 2021, ch. 721, § 1, subd. (c)(3)(B).) Section 1385 was further amended by Assembly Bill No. 200 (2021-2022 Reg. Sess.) (Assembly Bill No. 200), which moved section 1385, former subdivision (c)(3)(A)-(I) to subdivision (c)(2)(A)-(I).

Following Senate Bill No. 81's amendments to section 1385, a trial court sentencing a defendant found guilty of the crimes and enhancements at issue here would be required to impose only a single firearm enhancement under section 12022.53. Thus, Senate Bill No. 81's amendments would entitle defendant to more favorable consideration were he sentenced today. However, Senate Bill No. 81's provisions are not retroactive. Senate Bill No. 81 added subdivision (c)(7) to section 1385, which provided: "This subdivision shall apply to sentencings occurring after the effective date of the act that added this subdivision." (Stats. 2021, ch. 721, § 1, subd. (c)(7).) Assembly Bill No. 200 amended subdivision (c)(7) to provide: "This subdivision shall apply to all sentencings occurring after January 1, 2022." Because defendant's sentencing hearing occurred before January 1, 2022, Senate Bill No. 81 does not apply to him.

B. *Retroactivity*

Despite the savings clause in section 1385, subdivision (c)(7), defendant argues that he is entitled to the ameliorative benefit of Senate Bill No. 81 because his judgment was not yet final on the date Senate Bill No. 81 became effective. He relies on our Supreme Court's decision in *Estrada*, which held that new laws reducing punishment for a crime are presumptively to be applied to defendants whose judgments are not yet final

19

as if the amendatory statute's effective date.  (*Estrada*, *supra*, 63 Cal.2d at p. 744.)  We disagree.

In *People v. Conley* (2016) 63 Cal.4th 646, at pages 655 to 656, our Supreme Court discussed the effect of a savings clause on *Estrada*'s holding:  "In *Estrada*, we considered the retroactive application of a statutory amendment that reduced the punishment prescribed for the offense of escape without force or violence.  'The problem,' we explained, 'is one of trying to ascertain the legislative intent—did the Legislature intend the old or new statute to apply?  Had the Legislature expressly stated which statute should apply, its determination, either way, would have been legal and constitutional.'  (*Estrada*, *supra*, 63 Cal.2d at p. 744.)  But in the absence of any textual indication of the Legislature's intent, we inferred that the Legislature must have intended for the new penalties, rather than the old, to apply.  (*Id*. at pp. 744-745.)  We reasoned that when the Legislature determines that a lesser punishment suffices for a criminal act, there is ordinarily no reason to continue imposing the more severe penalty, beyond simply ' "satisfy[ing] a desire for vengeance." '  (*Id*. at p. 745, quoting *People v. Oliver* (1956) 1 N.Y.2d 152, 160.)  Thus, we concluded, '[i]t is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply,' including 'to acts committed before its passage[,] provided the judgment convicting the defendant of the act is not final.'  (*Estrada*, *supra*, 63 Cal.2d at p. 745.)  "Because the *Estrada* rule reflects a presumption about legislative intent, rather than a constitutional command, the Legislature . . . may choose to modify, limit, or entirely forbid the retroactive application of ameliorative criminal-law amendments if it so chooses.  Thus, as we explained in *Estrada*, the presumption does not govern when the statute at issue includes a 'saving[s] clause' providing that the amendment should be applied only prospectively.  (*Estrada*, *supra*, 63 Cal.2d at p. 747; see *People v. Floyd* (2003) 31 Cal.4th 179, 184-188.)"  The *Conley* court further observed:  "[W]e have since

20

made clear that . . . such express statements unquestionably suffice to override the *Estrada* presumption." (*People v. Conley*, *supra*, 63 Cal.4th at p. 656.)

In *People v. Buycks* (2018) 5 Cal.5th 857, at pages 881 to 882, our Supreme Court again clarified: "The *Estrada* rule rests on the presumption that, *in the absence of a savings clause providing only prospective relief or other clear intention concerning any retroactive effect*, 'a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not.' " (Italics added.)

The Legislature included a savings clause in Senate Bill No. 81, which overrode the *Estrada* presumption. We are unpersuaded by defendant's argument to the contrary.

C. *Equal Protection*

Undeterred, defendant contends that that when a statutory amendment directly reduces punishment, as opposed to merely providing a possible ameliorative benefit to the accused as a matter of procedure, the constitutional rights to due process and equal protection under the law compel retroactive application of the amendment to non-final judgments. In other words, defendant argues he is entitled to Senate Bill No. 81's benefits because the bill's amendments to section 1385 would significantly reduce his sentence from what was originally pronounced, and therefore the legislation "goes far beyond the threshold that triggers the *Estrada* rule, namely, providing 'a possible ameliorating benefit for a class of persons.' " (Citing *People v. Frahs* (2020) 9 Cal.5th 618, 624.) As we will explain, we conclude that the Legislature did not violate defendant's rights to equal protection and due process by including a savings clause in Senate Bill No. 81.

The equal protection clause of the Fourteenth Amendment to the United States Constitution provides: "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws." Similarly, California's Constitution provides: "A person may not be . . . denied equal protection of the laws." (Cal. Const., art. I, § 7, subd. (a).)

21

Although California's constitutional guarantee is independent of the federal guarantee, it is applied identically to the federal guarantee in all cases except for classifications based on gender. (*Connerly v. State Personnel Bd.* (2001) 92 Cal.App.4th 16, 31.) " ' "Broadly stated, equal protection of the laws means 'that no person or class of persons shall be denied the same protection of the laws [that] is enjoyed by other persons or other classes in like circumstances in their lives, liberty and property and in their pursuit of happiness.' [Citation.]" [Citation.] . . . Thus, . . . a threshold requirement of any meritorious equal protection claim "is a showing that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner. [Citation.]" [Citation.] "This initial inquiry is not whether persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged.' " ' " (*People v. Cruz* (2012) 207 Cal.App.4th 664, 674.)

We agree with defendant that Senate Bill No. 81 creates two classes of similarly situated criminal defendants: defendants in whose cases multiple firearm enhancements were found true, but whose sentencing hearings occurred 1) before, or 2) after the effective date of Senate Bill No. 81. Because Senate Bill No. 81's prohibition of imposing multiple enhancements only applied to those sentencing hearings occurring on or after January 1, 2022, the Legislature has treated similarly situated defendants differently based on the date of their sentencing hearings.

Where, as here, the two groups are similarly situated, we must ask whether disparate treatment of the groups is justified. (*People v. McKee* (2010) 47 Cal.4th 1172, 1207.) The high court under federal law has prescribed different levels of scrutiny depending on whether the law "targets a suspect class." (*Romer v. Evans* (1996) 517 U.S. 620, 631.) "At a minimum, a statutory classification must be rationally related to a legitimate government purpose. [Citations.] Classifications based on race or national origin [citation], and classifications affecting fundamental rights [citation] are given the most exacting scrutiny. Between these extremes of rational basis review and strict

scrutiny lies a level of intermediate scrutiny, which generally has been applied to discriminatory classifications based on sex or illegitimacy." (*Clark v. Jeter* (1988) 486 U.S. 456, 461; *Connerly v. State Personnel Bd.*, *supra*, 92 Cal.App.4th at pp. 31-32, citing *United States v. Virginia* (1996) 518 U.S. 515, 532.)

Defendant contends that he has a fundamental interest in his personal liberty, requiring application of strict scrutiny. In support, he relies on *People v. McKee*, *supra*, 47 Cal.4th at page 1197, but that case is distinguishable. In *McKee*, our Supreme Court considered changes to the Sexual Violent Predator Act that would increase a sexually violent predator commitment from two years, renewable upon the People's proof beyond a reasonable doubt that the committee was still a sexually violent predator, to an indeterminate term from which the committee could only be released if he proved by a preponderance of the evidence that he was no longer a sexually violent predator. (*McKee*, at pp. 1183-1184, 1185-1188.) The court concluded that sexually violent predators were similarly situated to mentally disordered offenders and defendants found not guilty by reason of insanity, and as to those groups the People retained the burden to demonstrate beyond a reasonable doubt that the commitment was appropriate. (*Id.* at pp. 1200-1202, 1203, 1207.) But while the court in *McKee* appeared to take the view that distinctions between individuals subject to *civil commitments* are subject to strict scrutiny (*Id.* at p. 1210), that case did not involve the prospective application of a statute reducing the punishment for *crimes*.

Defendant also relies on *People v. Olivas* (1976) 17 Cal.3d 236, which considered an equal protection challenge to a statute that authorized a trial court to commit a defendant, who was convicted in adult court but was between 16 and 21 years of age, to the California Youth Authority for a term longer than the defendant would have received had he or she been sentenced as an adult. The court recognized: "Personal liberty is a fundamental interest, second only to life itself, as an interest protected under both the California and United States Constitutions." (*Id.* at p. 251.) However, subsequent

23

decisions clarified that *Olivas* should be read narrowly, and was not properly read to require application of strict scrutiny whenever a defendant challenges a penal statute authorizing different sentences for comparable crimes. For example, in *People v. Wilkinson* (2004) 33 Cal.4th 821, the court applied the rational basis test to a statutory scheme allowing a lesser offense of battery without injury to be punished more severely than a greater offense of battery with injury. (*Id.* at p. 838.) The court noted, "A defendant . . . 'does not have a fundamental interest in a specific term of imprisonment or in the designation a particular crime receives.' " (*Ibid.*)

In *People v. Floyd*, *supra*, 31 Cal.4th 179, our Supreme Court applied the rational basis test and rejected the defendant's claim that denying him the benefits of Proposition 36 violated his right to equal protection. (*Id.* at pp. 188-191.) Proposition 36 ameliorated the punishment for persons convicted of nonviolent drug offenders, and it included an express savings clause specifying that it shall be applied prospectively. (*Floyd*, at pp. 183-185.) The court reasoned: "Defendant has not cited a single case, in this state or any other, that recognizes an equal protection violation arising from the timing of the effective date of a statute lessening the punishment for a particular offense. Numerous courts, however, have rejected such a claim—including this court. [Citation.] 'The Legislature properly may specify that such statutes are prospective only, to assure that penal laws will maintain their desired deterrent effect by carrying out the original prescribed punishment as written.' " (*Id.* at p. 188.) The court recognized as "legitimate the practical concerns associated with the transition from one sentencing scheme to another, such as resentencings. (*Id.* at p. 191.) "Resentencing numerous defendants was plainly a result the [Legislature] sought to avoid by according the statute prospective effect. In addition, the [Legislature] may not have wanted to encourage defendants to file meritless appeals designed simply to stretch out the time to finality. '[T]he 14th Amendment does not forbid statutes and statutory changes to have a beginning, and thus to discriminate between the rights of an earlier and later time.' " (*Ibid.*) As one court

subsequently stated:  the rule "is that a statute ameliorating punishment for particular offenses may be made prospective only without offending equal protection, because the Legislature will be supposed to have acted in order to optimize the deterrent effect of criminal penalties by deflecting any assumption by offenders that future acts of lenity will necessarily benefit them."  (*People v. Kennedy* (2012) 209 Cal.App.4th 385, 398.)

Consistent with *Floyd* and *Kennedy*, we conclude prospective application of amended section 1385 does not affect a fundamental right, is not based on a suspect classification, furthers legitimate state interests, and does not unfairly discriminate against defendant.  Defendant's constitutional claim fails.

IV

*Pitchess*

Defendant asks us to conduct an independent review of the records of the trial court's hearing on his *Pitchess* motion to obtain discovery of the relevant officer's personnel records.  (See *People v. Mooc* (2001) 26 Cal.4th 1216, 1225-1226.)  We have done so and find no error.

With a *Pitchess* motion, a criminal defendant can "compel discovery" of certain information in police officer personnel files.  The defendant must first demonstrate good cause by making "general allegations which establish some cause for discovery" of the information and by showing how it would support a defense to the charge against him.  (*Pitchess v. Superior Court*, *supra*, 11 Cal.3d at pp. 536-537; see Evid. Code, § 1043, subd. (b)(3).)  If the trial court concludes good cause has been established, the custodian of the officer's records brings to court all the potentially relevant records and, in camera, the trial court determines whether any information from the records need be disclosed to the defense.  (*People v. Mooc*, *supra*, 26 Cal.4th at p. 1226.)

Defendant filed a motion seeking material relevant to Officer John Lopez's dishonesty or false reporting. His motion asserted that Lopez gave defendant *Miranda*[8] warnings and interviewed him while he was at the hospital being treated for a gunshot wound. Lopez used a translation service to conduct the interview, because defendant did not speak English. The interview was not recorded, and Lopez conducted the interview alone, and therefore only Lopez could confirm whether he gave defendant *Miranda* warnings. The prosecution informed defendant in discovery that Lopez may have material in his personnel file subject to disclosure under *Brady v. Maryland* (1963) 373 U.S. 83. Defendant contended that the trier of fact would have to rely on Lopez's credibility to determine whether defendant made the statements attributed to him, to assess Lopez's characterization of defendant's demeanor, and to determine whether defendant waived his *Miranda* rights.

The trial court found good cause to conduct an in camera review of Lopez's records to determine whether Lopez's record included any discoverable instances of dishonesty or false reporting that might bear on his credibility. Following the court's review of the records, it ordered discovery of material responsive to defendant's motion, and it issued a protective order limiting the use of the material.

We will not disturb a trial court's ruling on a *Pitchess* motion absent an abuse of discretion. (*Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1039.) Having independently reviewed the sealed transcript of the *Pitchess* proceeding, we conclude the court followed proper *Pitchess* procedures and did not erroneously withhold any information. (See *People v. Fuiava* (2012) 53 Cal.4th 622, 646-648.)

---

[8] *Miranda v. Arizona* (1966) 384 U.S. 436.

26

# V

## *Fines and Fees*

Relying primarily on *People v. Dueñas*, *supra*, 30 Cal.App.5th 1157, defendant contends the trial court violated his federal and California constitutional rights by imposing an $80 court operations assessment fee (Pen. Code, § 1465.8), a $60 court facilities fee (Gov. Code, § 70373), and a $300 restitution fine (Pen. Code, § 1202.4) without first determining his ability to pay.  The court also required defendant to pay $12,000 in victim restitution to the Hodges family, an amount to be determined to the Myers family, and $7,500 to the Victim Compensation Board.  In imposing the court operations and facilities fees and the restitution fine, the court stated:  "I would have the record reflect that I'm going to minimize these fines such that to the extent that the defendant's prison earnings become available, they should be dedicated to repayment of the family and to the Victim Compensation Board rather than being paid to the State of California."  The court waived the main jail booking fee, classification fees, and the cost of preparing the sentencing report.  In doing so, the court stated:  "Again, to make as much money available as possible to the payment of restitution."

Defendant's argument is based on his contention that the trial court did not consider his ability to pay when imposing the fines and fees.  First, because defendant was sentenced on June 25, 2021--well after the *Dueñas* opinion was issued--and no *Dueñas* objection was lodged, defendant's challenge has been forfeited.  (*People v. Lowery* (2020) 43 Cal.App.5th 1046, 1053-1054.)  However, because defendant argues counsel was ineffective for failing to object, we reach the merits of the claim and find the claim fails on the merits because the trial court *did* consider defendant's ability to pay.

As we have set forth above, the court expressly stated its intent to impose the minimum amount of fines and fees (and to strike other fees) so that defendant's prison earnings could primarily go toward paying victim restitution.  In other words, the court purposefully imposed a low amount of fees so that more of defendant's earnings could go

toward restitution. The court was entitled to consider defendant's prison wages in determining his ability to pay the imposed fines and fees. (See *People v. DeFrance* (2008) 167 Cal.App.4th 486, 505 [defendant sentenced to prison did not show absolute inability to pay $10,000 restitution fine even though prison wages would make it difficult for him to pay the fine, it would take a very long time, and the fine might never be paid]; *People v. Ramirez* (1995) 39 Cal.App.4th 1369, 1377 [a trial court may consider the defendant's future ability to pay, including his ability to earn wages while in prison]; *People v. Hennessey* (1995) 37 Cal.App.4th 1830, 1837 ["defendant's ability to obtain prison wages and to earn money after his release from custody" are properly considered when determining whether a defendant has the ability to pay].) Because the court expressly set the amount of fines and fees at a level defendant could pay relatively quickly through his prison wages, defendant's claim lacks merit.

## DISPOSITION

The judgment is affirmed.


_____/s/_____
Duarte, Acting P. J.


We concur:


_____/s/_____
Krause, J.


_____/s/_____
Earl, J.